ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 NOV 16   AM 9: 48

DEPUTY CLERK_____

UNITED STATES OF AMERICA

v.

LARRY WASHINGTON (1)
DR. ROBERT MANDELL (2)
IFEANYI "TIM" EGUBUCHUNAM (3)
HENRIETTA PRICE (4)
DAVID BANDA (5)
WILLIE J. ATKINS (6)
PERRY ROWELL (7)
MCARTHUR BAKER (8)
DORIS BERRY (9)
BYRON BONDS (10)
MICHAEL BOWEN (11)
PATRICIA BROWN (12)
CALANDRA CUMBY (13)
TONYA EVANS (14)
DARRELL GLASCO (15)
REGINA HOWARD (16)
WILLARD JOHNSON (17)
PALANTE MCCLAIN (18)
RHONDA MCCOY (19)
VONTRIL MCCLEMORE (20)
REGINA MITCHELL (21)
WANDA PROCTOR (22)
RHONDA SANDERS (23)
CLARINDA SCOTT (24)
PATRICIA SKINNER (25)
JANYCE INGRAM (26)
BRENDA HALL (27)
CASSANDRA SIMS (28)

3 - 15 CR - 5 1 9 - L

**Information – Page 1**

## INFORMATION

The United States Attorney charges:

## SUMMARY

1.      Beginning in or around January 1, 2009, and continuing until in or about June 2015, the defendants, Larry Washington, Dr. Robert Mandell, Ifeyani "Tim" Egbuchunam, Henrietta Price, David Banda, Willie Atkins, Perry Rowell, McArthur Baker, Doris Berry, Byron Bonds, Michael Bowen, Patricia Brown, Calandra Cumby, Tonya Evans, Darrell Glasco, Regina Howard, Willard Johnson, Palante McClain, Rhonda McCoy, Vontril McClemore, Regina Mitchell, Wanda Proctor, Rhonda Sanders, Clarinda Scott, Patricia Skinner, Janyce Ingram, Brenda Hall, Cassandra Sims, and others yet uncharged, engaged in a complex and sprawling health care fraud scheme designed to improperly siphon and steal money from the Department of Labor's (DOL) Office of Worker's Compensation Programs (OWCP).

2.      This scheme involved the use of bribes, unnecessary medical treatment, fraudulent billing, and the falsification of medical documents.

3.      In total, the defendants were able to collectively fraudulently bill the federal government, through the OWCP, for more than $9.5 million and receive in excess of $8.7 million in government payments based on their fraudulent billing.

## Introduction

4.      The scheme began with former or current government employees – United States Postal Employees or Veterans Affairs (VA) employees – who claimed that they

had been injured during the course of their work duties.  These individuals are referred to hereinafter as "claimants."

5.      Under the OWCP, a claimant could receive workers' compensation payments (typically between 66% and 75% of pre-disability wages, tax free) and paid medical treatment, if a qualified doctor deemed the medical services necessary to treat the injury and if the injury prevented the claimant from working.

6.      A DOL claims examiner, that is an individual employed by DOL to review claims, would then review the claim submitted by the claimant, including documentation provided by the physician, and either approve or reject the claim.  A claimant could not be paid unless a DOL claims examiner approved the claim.

7.      In certain circumstances, if an on-the-job injury caused permanent damage, a claimant could have received a "scheduled award" – that is a lump sum payment meant to compensate that individual for their injury.  These awards often amounted to several hundred thousand dollars.  Again, a qualified doctor was required to certify the injury and the claim would then have to be approved by the DOL claims examiner, before the claimant was paid.  The amount of time to have scheduled claims approved often lasted over 12 months given the volume of claims submitted to the DOL.

8.      Claimants often sought the help of professionals (typically former DOL claims examiners) in filing their claims and in getting their claims approved.  These individuals, known hereinafter as "claim representatives," either charged a claimant a percentage of any paid claim or a flat fee associated with their work in getting a claim approved.

9.     When doctors and other medical providers treated the claimants, they could bill OWCP for their work if they submitted the proper documentation (i.e. medical evidence) and certified that the service for which reimbursement was sought was performed as described, necessary, and appropriate.

10.     Beyond a treating doctor, claimants could also be treated by other medical providers, such as licensed professional counselors, physical therapists, chiropractors, and massage specialists.     Treatment by these professionals was eligible for reimbursement by the OWCP if proper documentation was submitted and a treating physician certified that such treatment was necessary to treat the injury.

## DEFENDANTS

11.     The defendants can, for purposes of this Information, be properly divided into five groups:  (1) claimants, (2) doctors/medical providers, (3) DOL claim examiners, (4) claim representatives, and (5) employees of medical providers.

### *Claimants*

12.     Defendants McArthur Baker, Doris Berry, Byron Bonds, Michael Bowen, Patricia Brown, Calandra Cumby, Tonya Evans, Darrell Glasco, Regina Howard, Willard Johnson, Palante McClain, Rhonda McCoy, Vontril McClemore, Regina Mitchell, Wanda Proctor, Rhonda Sanders, Clarinda Scott, Patricia Skinner, Janyce Ingram, Brenda Hall, and Cassandra Sims were all claimants and former postal or VA employees.  Each of these claimants claimed that they had suffered an on-the-job-injury that prevented them from returning to work.  These injuries ranged from strains to trigeminal neuralgia.

Many of these claimants had not returned to work for several years. For example, claimant Clarinda Scott has received periodic roll payments since May 2004.

13.   DOL has made payments of approximately $11.4 million to these claimants for their compensation or for medical services.

14.   As a result of the guilty pleas associated with this Information, the government anticipates that it will prevent the payment of an estimated $11 million in future payments to the claimant defendants.

### *Doctors and Medical Providers*

15.   Defendant Larry Washington was a licensed professional counselor and ran businesses known as AAA Mental Health, LLC, Mind Spa, Inc., Solutions Health and Rehabilitation, and Convergence Emergence Diversion. These businesses were located in the Northern District of Texas. Through these businesses, Washington purportedly provided patients with counseling, pain management, chiropractic services, physical therapy, and massage services. Washington's patients were former postal and VA employees who had suffered on-the job-injuries and were eligible to receive medical services and workers compensation related to those injuries.

16.   An individual identified here as B.S. was a medical doctor and received his medical degree from Meharry Medical College and has been in practice for 22 years. B.S. was the owner of an entity known here as G.R., and maintained offices in Dallas, Texas and Lancaster, Texas. B.S. first began billing DOL through G.R. in February 2003.

17.     Defendant Dr. Robert Mandell was a licensed psychologist with over 35 years of experience in treating patients.  He is also the President, CEO, Clinical Director, and part owner of AAA Mental Health, LLC, which maintained offices in Richardson, Texas.  Dr. Mandell first began billing DOL in 2004.  Dr. Mandell and Washington worked together for a number of years prior to 2011.

18.     Defendant Henrietta Price was a licensed professional counselor and provided counseling services at Mind Spa, Inc., a business controlled by defendant Larry Washington.  Price was under contract with Mind Spa, Inc. until April 2012.  Price visited patients at Mind Spa, Inc.'s offices.

19.     Defendant Willie J. Atkins was a licensed professional counselor and provided counseling services at Mind Spa, Inc., a business controlled by defendant Larry Washington.  Atkins was under contract with Mind Spa, Inc. until July 1, 2011.  Atkins visited patients at Mind Spa, Inc.'s offices.

### DOL Claims Examiners

20.     Defendant Perry Rowell was a Senior Claims Examiner at the OWCP and began working there in 2001.  Rowell has over 22 years of federal government services.  Rowell was assigned to the Dallas District Office.

### Claims Representatives

21.     Defendant Ifeanyi "Tim" Egbuchunam is a former DOL claims examiner and represented claimants before the OWCP.  Egbuchunam has over 29 years of federal government services.  Egbuchunam began his carrier with DOL in 1986 and retired on

June 30, 2009 as a Supervisory Worker's Compensation Claims Examiner.  Egbuchunam was assigned to the Dallas District Office.

### *Employees of Medical Providers*

22.     Defendant David Banda began working as an employee at Mind Spa, Inc. in February 2009 and served as an Office Administrator and biller for Washington's businesses.  Banda reported directly to Washington.

## BACKGROUND ON OWCP

23.     The Federal Employees Compensation of Act (FECA) provides disability compensation benefits and payment for medical and rehabilitation care for civilian employees of the federal government who sustained on-the-job injuries or employment-related occupational illness.  FECA is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

24.     The OWCP is responsible for administering FECA.  The FECA program is administered by the OWCP located in 12 district offices throughout the United States, and financed by the Employees' Compensation fund, which consists of funds appropriated by Congress directly, or indirectly through a charge back system and administrative fees to the various federal agencies, including the U.S. Postal Service and the U.S. Department of Labor.

25.     Employees are entitled to receive all medical services, appliances or supplies, which a qualified physician prescribes or recommends and which the OWCP considers necessary to treat the work-related injury. If an employee has no dependents, compensation is generally payable at the rate of two-thirds of pre-disability gross wages,

tax-free; if an employee has one or more dependents, compensation is payable at the rate of three-fourths of pre-disability gross wages, tax-free. Benefits are only available while the effects of a work-related condition continue. Compensation for wage loss due to disability is only available while an employee's work-related medical condition prevents the employee from earning the wages earned before the work-related injury. Transportation expenses for authorized medical services may also be reimbursed.

26.    Claims examiners at OWCP manage workers' compensation claims. District Office 16 in Dallas, Texas handles all claimants residing in or surrounding the Dallas/Fort Worth Metroplex area.

27.    Providers are required to enroll with OWCP in order to receive payment from the federal government for services rendered to injured postal employees.

28.    Once enrolled, OWCP, through its billing agent, assigned the provider with a provider number.

29.    In order to receive reimbursement from OWCP, providers must submit "Health Insurance Claim Forms" (commonly referred to as a "HCFA-1500" by the health insurance industry) seeking payment for services or procedures rendered. Medical billing codes are used on the HCFA-1500. The Current Procedural Terminology ("CPT") codes, used on the HCFA-1500, are standardized alphanumerical codes that describe health care services and procedures to payers of reimbursement. Many CPT codes are time based, including CPT code 96101 which is used for psychological testing for both face to face time and interpreting results for approximately 60 minutes, and CPT code 90808 which is used for individual psychotherapy for approximately 75 to 80 minutes. HCFA-1500

forms may be submitted either electronically or in hard copy. Once a claim is submitted and approved for reimbursement, OWCP either electronically deposits or mails reimbursements to providers from U.S. Treasury funds.

30.     When providers submit claims to OWCP, they certify that the service for which reimbursement is sought was performed as described, necessary, appropriate, and properly billed in accordance with accepted industry standards; similarly when providers accept payments from OWCP, they certify that the service for which reimbursement is sought was performed as described, necessary, appropriate, and properly billed in accordance with accepted industry standards.

31.     Accepted industry standards preclude up-coding billed services for extended medical appointments when the employee actually had a brief routine appointment; charging for the services of a professional when a paraprofessional or aide performed the service; and prohibit unbundling services to charge separately for services that should be billed as a single charge.

32.     All claims for medical and surgical treatment, appliances or supplies furnished to injured employees must be supported by medical evidence, so the providers can supply OWCP with a history of the injury, a description of the nature and extent of the injury, the results of and diagnostic studies performed, the nature of the treatment rendered, and the degree of any impairment and/or disability arising from the injury.

33.     Reimbursement for chiropractic services is limited by the FECA, however a chiropractor may provide services in the nature of physical therapy under the direction of, and as prescribed by, a qualified physician.

## SCHEME TO DEFRAUD

### *Recruitment of Claimants*

34.    Larry Washington sought out and recruited former postal employees as claimants. Washington paid fees to individuals who referred him new patients, who claimed to be suffering from an injury which prevented them for returning to work. These referrals often came from various postal union representatives, postal employees, patients, and various DOL claims representatives.  As Washington knew, although these individuals had once suffered a work-related injury, their injuries were not severe enough to warrant continued workers' compensation payments.

35.    These claimants included, but are not limited to, Baker, Berry, Bonds, Bowen, Brown, Cumby, Evans, Glasco, Howard, Johnson, McClain, McCoy, McClemore, Mitchell, Proctor, Sanders, Scott, Skinner, Ingram, Hall, and Sims.

36.    These claimants were often concerned that if they did not receive continued certification of their injuries, that they would have to return to work.

### *Referrals for Certification and Prescriptions*

37.    In an effort to further the scheme, Washington would refer, direct, and send these claimants to B.S. for an evaluation, because he knew that B.S. would certify the patient for continued workers compensation and certify that the patients suffered from "chronic pain," even if the claimant did not, in fact, qualify, or was otherwise suffering from "chronic pain."

38.     Washington paid B.S. for these "certifications." For example, on October 1, 2010, Washington paid B.S. $4,000.00.   There was no legitimate reason for these payments.

39.     Beyond the direct improper payments by Washington, B.S. built a patient roster through these referrals and was able to bill DOL for his "treatment" of these patients.

40.     In addition to certifying the patients, B.S. would further prescribe certain therapy for these claimants that Washington, through his companies – notably Mind Spa, Inc. – could theoretically provide.   These prescriptions allowed Washington to further bill OWCP for these patients.

41.     Egbuchunam would also refer certain clients of his (claimants) to B.S. for certification.   On many occasions on documents he submitted to B.S., Egbuchunam would identify, before the patient had ever been seen by B.S., the exact diagnoses for the patient, because Egbuchunam knew (given his prior experience as a claims examiner) what diagnoses would qualify for certification or re-certification of workers' compensation payments or other scheduled awards.   Egbuchunam had no medical training.  It was improper for Egbuchunam to provide the medical diagnoses before the patient had been seen by B.S.

42.     Again, B.S. built his patient roster through these referrals and was able to bill DOL for his "treatment" of these patients.

43.     In return for these referrals, B.S. would also prescribe certain medical equipment for these claimants and the prescription would be filled by a company

controlled and owned by Egbuchunam. Thus, Egbuchunam could profit from his relationship with B.S., not only through the "certifications" of his clients, but also through the billing of this medical equipment, that, in many cases, was unnecessary.

44. Washington also paid Egbuchunam for his assistance in getting claims upgraded. Washington paid Egbuchunam between $3,750 and $10,000 a month for this assistance. As Washington knew, and as discussed further below, Egbuchunam was successful in getting claims upgraded, at least in part, because he was bribing a DOL claims examiner.

### *Additional False Documentation by Providers*

45. Dr. Mandell, completed, signed, submitted and caused to be submitted fraudulent medical documents with Washington.

46. The medical documents were referred to as "Psychological Reports." Dr. Mandell or Washington would prepare the fraudulent Psychological Reports and then, Banda, who was an employee of Washington, submitted the falsified medical to OWCP.

47. The Psychological Reports were crucial to the scheme because for claimants to receive the proper upgrades and certifications, they needed a diagnosis and certification related to their mental state as it related to their physical injury.

48. For example, if a claimant had claimed an on-the-work back injury, B.S. would "diagnose" and "certify" the physical condition, while Dr. Mandell would "diagnose" and "certify" the patient's mental state as it related to the back condition – i.e. their inability to enjoy physical activities with their children.

49.     In many, the alleged mental aspect of the injury is what caused a lengthy delay to return work.

50.     Dr. Mandell knew Washington used the fraudulent documentation to file false claims and receive payment from OWCP for services not rendered.

51.     Upon completion and submission of the false documents, Dr. Mandell received payment from the DOL.  Dr. Mandell kept 25% of the DOL payment amounts and Washington received 75% of the DOL payment based on the false claims.

### *Improper Billing*

52.     Washington and those working with him, including Banda, Price, and Atkins, falsely and fraudulently submitted claims to the OWCP for health care services that were not provided to patients.

53.     In the medical documentation submitted to OWCP by Washington's businesses, there were numerous irregularities including: the lack of provider signatures, reports dated prior to testing dates, the same report submitted for multiple dates of service, and conflicting facts related to the patients.

54.     Washington often billed the federal government for services never rendered.  For example, on a given day, Washington would bill for an amount of timed services that were physically impossible given the number of medical providers Washington employed.

55.     For example, based on Mind Spa, Inc.'s office hours, an individual provider could provide 480 minutes of service during a normal work day.  Washington employed six identified qualified health care professionals.  Assuming all of the health care

providers worked on the same day, Mind Spa, Inc. could bill 2,880 minutes of services for a normal work day.   Yet, Mind Spa, Inc. billed for services requiring a minimum of 7,981 minutes on April 30, 2011.  There were four additional dates where Mind Spa, Inc. billed for services requiring a minimum of over 7,000 minutes.

56.   Washington billed for services that he allegedly provided to patients in Dallas, Texas, when, in fact, he was traveling and not present in Dallas, Texas.  For example, in medical forms and billings submitted to OWCP, Washington represented that he was the treating physician on 36 patients on March 5, 2011.  In sum, Washington billed DOL for 6,381 minutes on March 5, 2011.  Yet, Washington flew to New York with his daughter on March 4, 2011, and did not return until March 6, 2011.

57.   Washington billed for services that he allegedly provided to patients, even though he was in the hospital for his own medical treatment.   On November 19, 2010, Washington was taken by ambulance and admitted to Methodist Dallas Medical Center for a heart condition. Washington remained in the hospital at least until November 22, 2010, when he underwent heart surgery.   Yet, Washington represented to DOL that he was the treating physician on 25 patients on November 20, 2010, and billed DOL for those patients.

58.   After obtaining the chronic pain upgrade from B.S., at Washington's and Egbuchunam's request, Washington devised an additional scheme to back bill DOL for services not provided.  DOL allows providers to file claims through December 31st of the year following the original date of service.  This allows a provider to bill DOL for

services up to 729 days after the original date of service was provided.   This policy allowed Washington to back bill in 2013 for dates of service back to January 1, 2012.

59.   OWCP billing and payment records show that beginning on or about February 21, 2008, and continuing until September 4, 2014, Larry Washington billed DOL on behalf of postal FECA beneficiaries in excess of $12,000,000.00.

60.   Henrietta Price, who was a Licensed Professional Counselor, provided counseling services at Mind Spa, Inc.  Price saw no more than three or four patients a day for approximately an hour.   Price received the total amount of compensation paid by DOL for the services she provided at Mind Spa, Inc. until early 2011 – meaning she did not split these payments with other individuals.

61.   In or about March 2011, Washington changed Price's contract so that Price received 60% of the total amount of compensation paid by DOL for the services that she provided.

62.   Price and Washington then engaged in fraudulent billing related to the treatment Price provided to patients.  For example, beginning January 24, 2012, Mind Spa, Inc. billed 4 units of CPT code 90808, 24 times for DOL OWCP claimants: F.M., B.H., R.M. and J.I.  CPT code 90808 is a time-based code representing 75 to 80 minutes of treatment.  Price received payment for five hours of services for each claimant when she actually provided one hour of service for each claimant.

63.   On or about May 21, 2011, Price began treating patients under her own company, Lifeline Counseling.

64.     Price started treating former Mind Spa, Inc. patients at Lifeline Counseling. Price completed, signed, submitted, and caused to be submitted fraudulent medical documents.  The fraudulent billing by Price through Lifeline Counseling resulted in fraudulent billing of $186,750.47.  Price learned how to perform the fraud at Lifeline Counseling through her work with Washington and at Mind Spa, Inc.

65.     Willie J. Atkins was a Licensed Professional Counselor and provided counseling services at Mind Spa, Inc.  Atkins worked one to two days a week and saw no more than six patients for approximately 45 minutes to an hour in total.  Atkins received the total amount of compensation paid by DOL for the services he provided at Mind Spa, Inc. – meaning he did not split these payments with other individuals.

66.     Atkins engaged in fraudulent billing related to the treatment Atkins provided to patients.  For example, beginning January 26, 2010, Mind Spa, Inc. billed 4 units of CPT code 96101, 24 times for DOL OWCP claimants: N.A, D.G., J.P., A.P. and G.W.  CPT code 96101 is a time-based code representing one hour of treatment.  Atkins received payment for four hours of services for each claimant when he actually provided one hour of service to each claimant. The fraudulent DOL payment amount for CPT code 96101 is $6,574.18.

67.     As another example, Mind Spa, Inc. billed 132 units of CPT code 99215 for patient service provided by Atkins. CPT code 99215 is comprehensive evaluation and management or other outpatient visit for an established medical patient.  CPT code 99215 represents the most extensive type of medical office visit that could be billed.  LPCs –

which Atkins was – are not qualified to bill this medical code. The fraudulent billing related to this issue was $9,239.04

68.    On or about July 1, 2011, Atkins began treating patients under his own company, Atkins Counseling Center (ACC). Atkins started treating three former Mind Spa, Inc. patients at ACC. Atkins completed, signed, submitted, and caused to be submitted fraudulent medical documents related to these patients. Atkins fraudulently billed $260,658.30 at ACC.

### Payoffs to Claimants

69.    In an effort to maintain and enhance his ability to maximize billing with OWCP, Washington asked claimants to falsify medical documentation, which indicated that they had received services on days that they had not received services.

70.    The medical documentation was referred to as "Mood Inventories." At Washington's instruction, the claimants received the blank Mood Inventories from another co-conspirator, David Banda, an employee of Washington, along with calendars marked with predetermined dates for them to use on the fraudulent medical documents. Banda knew that the claimants were completing falsified medical documentation that would be used to improperly bill OWCP.

71.    Upon completion and submission of the forms, the claimants received $100 for each form that they completed.

72.    Over the course of the fraud:

a.    Baker received $ 3,000.00 in total from Washington. As a result of this falsified medical documentation, Washington was able to fraudulently bill $

32,803.44 from OWCP.   Baker knew that he was completing falsified medical documentation.

        b.     Berry received $5,900.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $ 60,628.29 from OWCP.   Berry knew that he was completing falsified medical documentation.

        c.     Bonds received $9,600.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $ 20,840.56 from OWCP.   Bonds knew that he was completing falsified medical documentation.

        d.     Bowen received $3,700.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $ 28,152.04 from OWCP.   Bowen knew that he was completing falsified medical documentation.

        e.     Brown received $2,000.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $51,237.69 from OWCP.   Brown knew that he was completing falsified medical documentation.

        f.     Cumby received $3,600.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $41,204.87 from OWCP.   Cumby knew that he was completing falsified medical documentation.

g.      Evans received $6,000.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $30,736.38 from OWCP.   Evans knew that he was completing falsified medical documentation.

h.      Glasco received $5,800.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $27,804.71 from OWCP.   Glasco knew that he was completing falsified medical documentation.

i.      Howard received $4,600.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $29,889.85 from OWCP.   Howard knew that he was completing falsified medical documentation.

j.      Johnson received $3,000.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $14,280.00 from OWCP.   Johnson knew that he was completing falsified medical documentation.

k.      McClain received $1,830.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $36,652.00 from OWCP.   McClain knew that he was completing falsified medical documentation.

l.      McCoy received $2,900.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill

$21,559.20 from OWCP. McCoy knew that he was completing falsified medical documentation.

m.      McClemore received approximately $2,500.00 in total from Washington. As a result of this falsified medical documentation, Washington was able to fraudulently bill $15,243.84 from OWCP. McClemore knew that he was completing falsified medical documentation.

n.      Mitchell knowingly and willfully completed false documentation regarding treatment she never received. As a result of this falsified medical documentation, Washington was able to fraudulently bill $48.633.66 from OWCP. Mitchell knew that he was completing falsified medical documentation.

o.      Proctor received $2,100.00 in total from Washington. As a result of this falsified medical documentation, Washington was able to fraudulently bill $18,367.14 from OWCP. Proctor knew that he was completing falsified medical documentation.

p.      Sanders received $3,600.00 in total from Washington. As a result of this falsified medical documentation, Washington was able to fraudulently bill $24,439.20 from OWCP. Sanders knew that he was completing falsified medical documentation.

q.      Scott received $3,600 in total from Washington. As a result of this falsified medical documentation, Washington was able to fraudulently bill $41,204.87 from OWCP. Scott knew that he was completing falsified medical documentation.

r.      Skinner received $2,000.00 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $24,207.02 from OWCP.   Skinner knew that he was completing falsified medical documentation.

s.      Ingram received $868.64 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $13,654.16 from OWCP.   Ingram knew that he was completing falsified medical documentation.

t.      Hall received $4,500.00 in total from Washington.   As a result of this falsified medical documentation, Washington was able to fraudulently bill $33,107.76 from OWCP.   Hall knew that he was completing falsified medical documentation.

u.      Sims received $1,000 in total from Washington.  As a result of this falsified medical documentation, Washington was able to fraudulently bill $30,958.64 from OWCP.   Sims knew that he was completing falsified medical documentation.

73.     Following their approval for payments from OWCP, Byron Bonds, Michael Bowen, Calandra Cumby, Regina Howard, Willard Johnson, Vontril McClemore, Rhonda Sanders, Clarinda Scott, Janyce Ingram, Brenda Hall, and Cassandra Sims applied for and were approved to receive Title II Disability Insurance Benefits, paid by the Social Security Administration (SSA).  In their applications for these benefits, these individuals alleged, generally, that the same condition for which they had applied for

OWCP payments caused a permanent disability within the meaning of the Social Security Act.

74.     According to the SSA's records, Byron Bonds, Michael Bowen, Calandra Cumby, Regina Howard, Vontril McLemore, Rhonda Sanders, and Clarinda Scott submitted medical evidence or opinions from Dr. Robert Mandell or Larry Washington in support of their claim for SSA disability benefits.

### Bribes to DOL Claims Examiner

75.     Beginning in or about January 2013, and continuing through in or about March 2015, OWCP Senior Claims Examiner Perry Rowell accepted a monthly bribe in the form of cash from Egbuchunam, who represented OWCP claimants.

76.     Specifically, on April 17, 2015, Egbuchunam met with Rowell at a park located within the Northern District of Texas.  During the meeting, Egbuchunam paid Rowell $1,000.00 in cash.

77.     On May 15, 2015, Egbuchunam met with Rowell at a Starbucks located within the Northern District of Texas.  During the meeting, and in a stall of a Starbucks bathroom, Egbuchunam paid Rowell $1,500.00 in cash.

78.     On May 22, 2015, Egbuchunam met with Rowell at a park located within the Northern District of Texas.  During the meeting, Egbuchunam paid Rowell $500.00 in cash.

79.     On June 19, 2015, Egbuchunam met with Rowell at a Potbelly located within the Northern District of Texas.  During the meeting, Egbuchunam paid Rowell $1,000.00 in cash.

80.     In total, Egbuchunam paid Rowell approximately $24,000.00 in bribes.

81.     In return for the money, Rowell expedited payments, up-graded accepted conditions, expedited scheduled award decisions, expedited scheduled award payments, and immediately responded to Egbuchunam's telephonic communications concerning technical case status questions.

82.     For example, on March 11, 2011, OWCP received a request for payment on an approved claim for a scheduled award from one of Egbuchunam clients.  Just two days later, on March 13, 2011, Rowell executed payment on the scheduled award request.  Scheduled awards payments are normally processed and paid within 9 months after they are received by the Dallas District Office, yet this specific claim was processed within two days.

<u>Count One</u>
Conspiracy to Commit Healthcare Fraud
[Violation of 18 U.S.C. § 1349]

83.    The allegations contained in paragraphs 1 through 81 are realleged and fully incorporated herein.

84.    Beginning on or about January 1, 2009, and continuing until in or about June 2015, in the Dallas Division of the Northern District of Texas, the defendants, Larry Washington, Dr. Robert Mandell, Henrietta Price, David Banda, and Willie Atkins, and others not yet charged, in connection with the delivery and payment for health care benefits, items, and services, did knowingly and willfully combine, conspire, confederate, and agree with each other, to violate 18 U.S.C. § 1347, that is, to execute and attempt to execute a scheme and artifice to defraud and obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control and custody of Federal Employees Compensation of Act (FECA), a health care benefit program as defined in 18 U.S.C. § 24(b).

In violation of 18 U.S.C. § 1349.

Count Two
Bribery of a Public Official
[Violation of 18 U.S.C. § 201]

85.   The allegations contained in paragraphs 1 through 83 are realleged and fully incorporated herein.

86.   Beginning in or about January 2013, and continuing through June 19, 2015, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant, Ifeanyi "Tim" Egbuchunam did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, with intent to influence an official act influence a public official to commit and aid in committing and to collude in, and allow, and to make opportunity for the commission of a fraud on the United States, induce a public official to do an act and omit to do an act in violation of his/her official duty.

In violation of 18 U.S.C. § 201.

<u>Count Three</u>
Bribery Received by a Public Official
[Violation of 18 U.S.C. § 201(b)(2)]

87.     The allegations contained in paragraphs 1 through 85 are realleged and fully incorporated herein.

88.     Beginning in or about January 2013, and continuing through in or about March, 2015, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant, Perry Rowell, a public official, directly and indirectly did personally and corruptly receive and accept something of value in return for being influenced in the performance of an official act.

In violation of 18 U.S.C. § 201(b)(2).

<u>Count Four</u>
### False Statement or Fraud to Obtain Federal Employees' Compensation
### [Violation of 18 U.S.C. § 1920]
### MISDEMEANOR

89.     The allegations contained in paragraphs 1 through 87 are realleged and fully incorporated herein.

90.     Beginning in or about January 1, 2009, and continuing through September 4, 2014, in the Dallas Division of the Northern District of Texas, defendants McArthur Baker, Doris Berry, Byron Bonds, Michael Bowen, Patricia Brown, Calandra Cumby, Tonya Evans, Darrell Glasco, Regina Howard, Willard Johnson, Palante McClain, Rhonda McCoy, Vontril McClemore, Regina Mitchell, Wanda Proctor, Rhonda Sanders, Clarinda Scott, Patricia Skinner, Janyce Ingram, Brenda Hall, and Cassandra Sims, with the intent to defraud, and to continue to receive workers' compensation benefits to which each them were not entitled, knowingly and willfully provided false information the United States Department of Labor, Office of Workers' Compensation Programs (DOL/OWCP) in connection with an application for and receipt of compensation and other benefits and payments under Title 5, United States Code, Chapter 81, Subchapter I and III., and as a result of which conduct each of the defendants did fraudulently receive benefits of less than $1,000.00 on at least one occasion.

JOHN R. PARKER
ACTING UNITED STATES ATTORNEY


_____

P.J. MEITL
Assistant United States Attorney
District of Columbia Bar No. 502391
Virginia Bar No. 73215
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8680
Facsimile: 214.659.8812
Email: philip.meitl@usdoj.gov


_____

A. JENNIFER BRAY
Special Assistant United States Attorney
Texas State Bar No. 00795844
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Tel:  214-659-8674
Fax: 214-659-8809
Email: jennifer.bray@usdoj.gov


_____

NICOLE DANA
Special Assistant United States Attorney
Texas State Bar No. 24062268
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone: 214.659.8694
Facsimile: 214.659.8805
Email: nicole.dana@usdoj.gov